MONEY STATION, INC., Appellant,

v.

ELECTRONIC PAYMENT SERVICES, INC. et al., Appellees.

[Cite as *Money Station, Inc. v. Electronic Payment Serv., Inc.* (1999), 136 Ohio App.3d 65.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990064.

Decided Dec. 23, 1999.

*Graydon, Head & Ritchey* and *John C. Greiner; Gibson, Dunn & Crutcher, L.L.P., Wesley G. Howell, Paul Blankenstein, David B. Salmons* and *Jason Schwartz,* for appellant.

*Cohen, Todd, Kite & Stanford, L.L.C.,* and *Michael R. Schmidt; Morgan, Lewis & Brockius, L.L.P., Peter Buscemi, Stephen Paul Mahinka, Brad Fagg* and *Laura A. Livaccari,* for appellees.

WINKLER, Judge.

This appeal arises out of a bench trial in a declaratory judgment action, wherein the trial judge found that the terms of an agreement between the parties was ambiguous and required extrinsic evidence to interpret the contractual provision at issue. Before this court can examine the assignments of error raised by plaintiff-appellant, Money Station, Inc., a detailed history of the case is necessary.

An automatic teller machine ("ATM") is a machine utilized by banks to allow customers with ATM cards to withdraw cash and to make balance inquiries, deposits, payment authorizations, and transfers of funds between accounts electronically, without the assistance of the traditional human teller. An ATM network is, essentially, an electronic telecommunications system. The ATM network has the capability to connect, through switches and gateways, various banks, other ATM networks, and data processing companies. This shared, information-exchange capability allows a customer of a bank to access the customer's account, any time of the day, via an ATM that may not be operated by that customer's bank. The access capability of the ATM industry has also led to such conveniences as point-of-sale transactions, whereby the banking customer can pay for groceries at the supermarket check-out lane with the ATM card.

ATM networks are identified by their marks, or brands, which are displayed both on ATM cards and on ATM machines. Bank customers may utilize ATM networks displaying the same brands identified on their ATM cards. For example, if the ATM card has only one brand, then the customer may only use an ATM machine that displays that brand. If, however, the ATM card displays two brands, it is then termed a dual-branded card, which enables the ATM cardholder to use both ATM networks. Furthermore, the ATM machines themselves might have two or more brands displayed, making the ATM a dual-branded machine. This access makes nationwide, and even worldwide, banking possible. In fact, this remote, account-access capability allows ATM networks to place their machines in locations away from banks, yet convenient to customers. But like most conveniences in life, this service is not always free.

In order for the ATM network to function, the transactions must be processed. Large banks with a large number of ATMs can, and often do, provide their own data-processing services. This is known in the industry as intercept processing. Customers whose banks utilize intercept processing usually do not pay the fee for that service when using their own bank's ATMs or when conducting an ATM transaction at an ATM utilizing their bank's processing services.

Smaller banks, thrifts, and credit unions that do not own and operate a large number of ATMs usually contract with data-processing companies to provide

data-processing services. These types of data-processing companies are known as third-party processors. These third-party processors provide access to competing ATM networks through gateways, which, by connecting to dissimilar networks, allow customers wider access to their accounts due to the larger number of available ATMs. These third-party processors also compete for ATM network access, and can put their own ATM brand on both cards and ATMs.

The costs of using the convenience of an ATM vary. Banks may affiliate with one or more ATM networks to provide services for their customers. If a bank has chosen to do this, and if cardholders use an ATM owned and operated by their own bank, the transaction is often a free, "on-us," transaction, because the bank does not have to route the transaction through a switch or gateway to provide access to a customer's account. If, however, a cardholder uses an ATM owned and operated by another bank within the regional network, and that bank has chosen a competing ATM network as its primary network, the cardholder is often charged a small fee by the bank acquiring the transaction, and the cardholder may also be charged an additional fee by his own bank, which is called an issuer bank fee. These fees stem from the fact that the transaction must be routed through a gateway to the issuing bank's primary ATM network, where it is processed to determine if the customer has funds that the acquiring bank can disburse to the banking customer. These fees may increase significantly if a cardholder must use a national or international ATM network, because switching and routing the ATM transaction becomes more complicated. Thus, as a result of a banking customer's decision to use an ATM not owned and operated by his own bank, the fees imposed for using internetwork connections, or gateways, and for the data processing of those transactions can amount to several dollars for each transaction.

Based upon the evidence presented in this case, it is obvious that there are costs involved in maintaining large, switched-network systems and gateways that route transactions among the myriad of ATM networks. In addition, there are in excess of 200,000 ATMs throughout the United States, which cost the ATM network companies and banks money to operate and maintain. In light of the foregoing, we can now address the specifics of the dispute that gave rise to Money Station's declaratory judgment action.

Defendant-appellee Money Access Service, Inc. is a wholly owned subsidiary of defendant-appellee Electronic Payment Services, Inc. ("EPS"), which was formed in 1992 as a joint venture among four bank holding companies. Money Access Service, Inc., which operates under the trade name MAC, is an ATM network that operates ATMs throughout Michigan, Indiana, Ohio, Kentucky, West Virginia, Pennsylvania, New Jersey, Delaware, Maryland, and the New England states. In addition to providing ATM network services, MAC provides third-

party data processing transactions for banks. Consequently, it has the greatest share of the ATM market within the areas where it conducts business.

Money Station is, like MAC, an ATM network, but it operates a much smaller regional network throughout Ohio, Western Pennsylvania, Kentucky, and Indiana. Unlike MAC, Money Station does not provide processing services for its member institutions, but it routinely affiliates with Midwest Payment Systems for third-party data processing services. As a result, customers whose institutions utilize the Money Station ATM network often pay data processing fees when performing banking transactions through ATMs affiliated with banking institutions utilizing competing ATM networks.

As a result of MAC's control over the ATM network market, it has, in the past, excluded competing ATM networks from MAC's combined ATM network and from its third-party data processing services, unless the competing ATM networks paid additional access fees to MAC. As a result of MAC's control over the ATM market, the United States Justice Department brought an antitrust action against EPS and MAC in 1994. In settling the matter with MAC, the Justice Department, through a final judgment and consent decree entered in April 1994, prohibited MAC from, *inter alia*, requiring any of its regional ATM network customers to purchase ATM data processing through MAC, and from excluding other ATM networks from using its system.

Prior to the Justice Department's antitrust action, Money Station and MAC had, in 1993, entered into a letter of understanding regarding access to one another's networks. Apparently, Money Station was not satisfied with the terms of the letter of understanding after the Justice Department's 1994 settlement with EPS and MAC. Thus, in 1995, Money Station filed suit against EPS, MAC, and several other banking and ATM networks in the United States District Court for the Southern District of Ohio, alleging violations of the Clayton, Sherman, and Lanham Acts, in addition to various state-law claims.

The federal lawsuit settled on December 17, 1996, after a series of negotiations and proposed settlements were prepared and amended to suit the business needs of the parties. Within the final settlement agreement, there was one section that allowed MAC to charge gateway fees to users of a MAC ATM under certain situations. The confusion over when MAC could and could not charge its gateway fees erupted in litigation when Money Station, in 1997, filed this declaratory judgment action against EPS and MAC in the Hamilton County Court of Common Pleas, seeking a resolution to the disputed gateway-fee provision in the settlement agreement.

The contractual provision in dispute reads:

"For a period of ten (10) years from the execution of this Settlement Agreement, any MSI [Money Station, Inc.] issuer or Dual–Branded Issuer that elects MSI as its primary network shall pay MSI interchange rates at those MAC ATM devices that acquire MSI transactions. For POS [point-of-sale] transactions, MSI interchange rates shall apply to those transactions that are routed as MSI transactions. MAC shall not impose any charge on transactions described in the two preceding sentences, except that if MAC must process such a transaction through its switch in order to route the transaction to MSI, MAC may charge the Dual–Branded Acquirer gateway fees for the provision of such gateway access services, but such gateway fees must be equivalent to the gateway fees that MAC charges the Dual–Branded Acquirer for access to any network other than MSI."

Money Station claimed that, in violation of the foregoing paragraph, MAC improperly was charging dual-branded issuing banks gateway fees when their ATM cardholders utilized dual-branded ATMs. EPS and MAC responded that such issuer-gateway fees were not precluded under the terms of the disputed paragraph because the terms of the paragraph expressly provided that MAC could charge gateway fees for data processing services for customers of Money Station's ATM network when the transaction had to be routed through MAC's switch. Money Station asked the trial court to declare that the terms of the disputed paragraph were being violated, while EPS and MAC insisted that there was an ambiguity that allowed for the charging of issuer-gateway fees. The trial court found that the terms of the disputed paragraph were ambiguous and that extrinsic evidence was required in order to determine whether MAC could charge the disputed fees.

Money Station claims on appeal that the trial court erred in finding the disputed paragraph of the Settlement Agreement ambiguous and relying upon the admission of extrinsic evidence for proper interpretation of the agreement. Money Station also claims that the trial court's interpretation of the contract based upon extrinsic evidence was not supported by that evidence. We disagree.

Courts examine contracts in order to interpret and enforce the intended result of the parties. See *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519, 526; *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923; *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 55, 716 N.E.2d 1201, 1208. It must be presumed that the contractual language chosen by the contracting parties clearly expresses the intent of those parties. See *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499, 501; *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. If contractual terms are unambiguous, a court may not fashion a new contract or interpret

contractual terms in a manner not expressed by the clear intent of the parties. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 406, 374 N.E.2d 146, 150. Contractual terms are ambiguous, however, if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation. See *Aultman Hosp. Assn., supra; United States Fid. & Guar. Co., supra.*

■ The trial court found that the disputed paragraph was unclear. Specifically, the terms "interchange rates," "transactions," "routed," "switch," "gateway access services," "gateway fees," and "gateway" were not defined in the agreement. The trial court also found that the disputed paragraph did not clearly provide whether fees could be charged by the acquiring end of the transaction, that is, the bank where the ATM transaction was being conducted, and that the disputed paragraph was subject to equally reasonable, but different, interpretations.

Upon review of the voluminous record in this case, it became clear to this court that all parties resorted to the presentation of extrinsic evidence in an effort to explain the intended meaning of the disputed paragraph. Money Station, in relying upon documents that led up to the settlement agreement, was the first to present extrinsic evidence when it requested a temporary restraining order against EPS and MAC. Thus, it cannot now complain that extrinsic evidence was offered by EPS and MAC to explain the meaning and intent of the disputed paragraph in the agreement. See *Center Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 31 OBR 587, 511 N.E.2d 106. Furthermore, since the parties presented arguably supportable, but different, interpretations of the disputed paragraph, we hold that the trial court was correct in finding that the language of that paragraph was ambiguous and in allowing EPS and MAC to introduce extrinsic evidence to support their interpretation of the agreement. Therefore, we overrule the first assignment of error.

■ When a court finds a ambiguity in a contract, the court may look to extrinsic, or parol, evidence to determine the parties' intent. See *United States Fid. & Guar. Co.,* 129 Ohio App.3d at 55–56, 716 N.E.2d at 1208. "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Id.* at 56, 716 N.E.2d at 1208, citing *Blosser v. Carter* (1990), 67 Ohio App.3d 215, 219, 586 N.E.2d 253, 255–256; see, also, 4 Williston on Contracts (3 Ed.1961) 716–717, Section 618.

■ The Supreme Court of Ohio has held that "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the

witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276.

 In this case, the trial court weighed all of the testimony and the numerous exhibits presented by the parties, including extrinsic evidence surrounding the formation of the agreement between the parties. In particular, evidence was presented by EPS and MAC that the disputed paragraph did in fact allow for the charging of the issuer-gateway fees that Money Station so vigorously contends were not authorized. EPS and MAC presented documents that demonstrated an ongoing dispute regarding the gateway fees, and that business practices did not allow for the free gateway access sought by Money Station. Furthermore, as the trial court correctly pointed out in its decision, EPS and MAC expressly rejected Money Station's proposal for free network access in a letter from the president of EPS to the president of Money Station. Subsequently, Money Station altered the draft of the disputed paragraph, which EPS, in an internal memorandum, described as ambiguous and unclear with respect to whether gateway fees could be limited. EPS then communicated this concern to Money Station, which responded that the proposed wording was consistent with the previous letter of understanding. In addition, Money Station stated in its responsive letter, "The Settlement Agreement clarifies this by permitting one network (say MSI) to impose a charge on a transaction that 'belongs' to the other network (say MAC) if and only if the first network (MSI) must process such a transaction."

To further support the allowance of the gateway fees in question, evidence was presented that Money Station provided for such fees in its own fee schedule. EPS and MAC presented evidence that to forgo charging the disputed fee could result in a loss of $87,530,280 in fees for the performance of the required gateway-processing services. EPS and MAC argued that such a staggering loss in revenue would not make good business sense, a point that this court deems well taken and that was obviously given significant weight by the trial court in its conclusion that EPS and Money Station misunderstood whether the disputed issuer-gateway fee could be charged.

Based upon the foregoing, the trial court concluded that the parties did not have a meeting of the minds regarding the imposition of the disputed fees when they entered into their agreement in December 1996. Consequently, the court interpreted, based upon extrinsic evidence, that the intent of the parties was not

to limit the disputed gateway fees. Because we find competent, credible evidence in the record to support the trial court's decision, we overrule the second assignment of error.

In sum, the trial court correctly found that the disputed paragraph in the settlement agreement between the parties was ambiguous. As a result, the trial court correctly allowed for extrinsic evidence to be presented in order to explain the intentions of the parties. Although Money Station objects to MAC charging issuer-gateway fees for ATM transactions processed and routed to Money Station, these fees are not prohibited by the parties' agreement. Therefore, we affirm the judgment of the trial court.

*Judgment affirmed.*

GORMAN, P.J., and SUNDERMANN, J., concur.