JOURNAL ENTRY and OPINION
A jury returned a $75,000 verdict in favor of defendant-counter-claimant Sylvester Robertson and against plaintiff-landlord AEMM Properties, Inc. on his breach of contract claim. The primary issue on appeal is whether the court erred by denying judgment notwithstanding the verdict.
Because this appeal questions the court's refusal to grant AEMM's motion for judgment notwithstanding the verdict, we consider the evidence presented at trial and the facts established by admissions in the pleadings and in the record most strongly in defendant's favor and, if there is substantial evidence to support the jury's verdict, we must find the court did not err by denying the motion. See Civ.R. 50(B); Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St.2d 271, 275; Pariseau v. Wedge Products, Inc. (1988), 36 Ohio St.3d 124.
Robertson took over an existing retail bedroom and furniture business and sought to move the business to another location. He located suitable retail space in a strip shopping center owned by AEMM. Elie Abboud, a partner with AEMM, negotiated the lease.
The space had some problems. At the time the parties were negotiating the lease, AEMM had been put on notice that the premises Robertson wished to lease had numerous building code violations. Evidence showed that the city pointed out many of these same violations to AEMM two years earlier, but AEMM failed to remedy them. The building inspector reexamined the property shortly before the parties entered into a lease and submitted to them a list of code violations that required remediation.
With this list in hand, the parties agreed that before Robertson would take possession of the premises, AEMM would complete the following items: (1) an opening would be made upon the common wall within the premises, (2) a bathroom would be installed within the premises, (3) the exterior wall would be repaired,(4) stairs at the rear of the premises would be replaced, and (5) other exterior structural repairs would be made.
Robertson repeatedly stressed that timely completion of AEMM's items was critical because his existing lease was due to expire and he could not afford an interim lease at his present retail location.
Abboud hired an architect to draft plans that would incorporate the five lease items, and told the architect that the plans must be as simple as possible that he would have to do the least amount of work and he needed them done fast. When the architect told Abboud that he would have to draw everything according to code, Abboud said that he did not want that. Abboud did not want him to include drawings showing repairs to the exterior wall, plans for restrooms that would meet code requirements for handicapped access, or any work on the ceiling. The architect told Abboud that he had spoken with a city building inspector about the premises and the inspector told him that he didn't want me to cut any corners with the drawings on this building.
When the architect finished the plans, he called Abboud. Abboud asked the architect if the plans were drawn to code. When the architect confirmed that he had drawn the plans to code, Abboud said I told you not to draw it to code. When the architect confronted Abboud about these shortcomings, Abboud fired him.
Robertson became concerned that the premises were not being made ready for his occupancy, so he called the architect to check on his progress. The architect gave Robertson a set of the plans he had drawn up and Robertson presented them to the building inspector. The building inspector rejected the drawings and gave Robertson a list of code violations. When Robertson showed the list to the architect, it was the first time that the architect had seen the list of code violations.
Abboud retained a second architect, but that architect likewise did not have the benefit of seeing the list of code violations. The second architect submitted his own set of plans to the building inspector, but they were also rejected.
By this time, Robertson was left with an inventory of furniture and no place to store it. Abboud agreed to let him store the furniture in an empty retail space within the strip mall. Robertson did so, and at one point moved the furniture into the unfinished retail space. AEMM told Robertson to make other arrangements to store the furniture. AEMM did not make the renovations to the space, so Robertson could not obtain a certificate of occupancy. Robertson could not find alternative retail space, and his nascent furniture business folded without ever opening.
Robertson contacted the consumer help desk at a local television station for assistance in opening the store. AEMM filed a defamation action in response, and Robertson counterclaimed for breach of the lease agreement. AEMM dropped the defamation claim and the jury returned the contested verdict in Robertson's favor.
 I
The first assignment of error complains that the court erred by refusing to grant judgment notwithstanding the verdict because the jury lacked any basis for finding that AEMM breached the express terms of the lease agreement. AEMM argues that no provision of the lease required it to prepare the premises for occupancy within thirty days and, in fact, the thirty day provision was a restriction on Robertson's right of occupancy.
It is beyond debate that contracts which are clear and unambiguous present questions of law for the court; however, if a contract is subject to differing interpretations, a question of fact is presented. Cline v. Rose (1994), 96 Ohio App.3d 611, 615. An interpretation of an ambiguous term used in a contract is a question of fact and will not be reversed on appeal absent an abuse of discretion. Maines Paper Food Serv., Inc. v. Eanes, Cuyahoga App. No. 77301, unreported at 6. See, also, Ohio Historical Society v. General Maintenance Engineering Co. (1989),65 Ohio App.3d 139, 147. If the contract is ambiguous, the trier of fact must ascertain the intent of the parties. See Money Station, Inc. v. Electronic Payment Servs., Inc., 136 Ohio App.3d 65.
Paragraph 2 of the contract states:
 2. Use of Premises (a) Tenant shall use and occupy the premises as a furniture store. * * * (d) Prior to Tenant's taking possession, Landlord shall (1) effect an opening upon the common wall within premises on the street level; (2) install a bathroom within the lease premises; (3) repair the exterior wall of the lease premises; (4) replace the stairs at the rear of the lease premises; and (5) any other structural repairs to the exterior of the lease premises.
 Once in the premises Tenant agrees to assume full responsibility and at it's [sic.] own cost to keep and maintain the Premises neat, clean in proper repair and decor and free from waste and offensive vermin, rodents, bugs and other pests, and to make any and all repairs necessary to maintain the property in quality operation.
 (e) Tenant will be responsible for the interior of the building only except for exterior windows, panes and accessories.
 Tenant will pay a twenty-percent (20%) prorata share of common area maintenance [sic.] (cam) charges based upon premises leased and common areas. * * *
 (f) Landlord will provide a statement annually to Tenant showing a reconciliation between the estimated CAM charges paid and actual costs to Landlord. * * *
 (g) Tenant will have thirty (30) days from the date of this lease to complete repairs and improvements.Tenant must occupy the premises by the end of the thirty (30) day period, time of the essence.
Paragraph 3(g) is ambiguous because it appears to place on the tenant the duty to make repairs or improvements that are the responsibility of the landlord. Paragraph 3(d) requires the landlord to make certain improvements to the property, and further requires that those improvements be made prior to Tenant's taking possession. The parties fully agree that this paragraph refers to the landlord.
Paragraph 3(g) states that the tenant will have thirty days in which to complete repairs and improvements. Paragraph 3(d) is the only place in the lease that discusses an obligation to make repairs or improvements, and that duty falls on the landlord. It is true that paragraph 3(e) does state that the tenant is responsible for the interior of the building, but nothing in that section suggests that the tenant will be making repairs or improvements. It is one thing for the tenant to be responsible for decorating the interior of a retail sales space; it is another thing to make the tenant responsible for repairs and improvements. The obligation to make repairs and improvements seem more in keeping with the landlord's duties as set forth in paragraph 3(d) than in paragraph 3(g). Certainly, repairs to an outside wall, construction of a restroom and installation of a stairway would fall under repair and improvements. The lease contains no other provision that would arguably place a similar duty on the tenant.
Because the lease agreement is ambiguous, the court was obligated to hear extrinsic evidence on the parties' intentions. Shifrin v. Forest City Ent., Inc. (1982), 64 Ohio St.3d 635, 638. For that reason, the court could not decide the issue as a matter of law, and therefore did not err by refusing to grant judgment notwithstanding the verdict.
AEMM makes additional arguments going to the weight of the evidence, but we cannot consider them. Civ.R. 50(B) states, * * * [b]ut no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. A motion for a judgment notwithstanding the verdict presents a question of law regarding the sufficiency of the evidence. See Jenkins v. Krieger (1981), 67 Ohio St.2d 314, 317-319. Thus, if reasonable minds could reach different conclusions regarding the evidence, the motion must be denied. Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees(1986), 28 Ohio St.3d 13, 15. Because the remaining parts of AEMM's arguments go to the weight of the evidence, the court could not enter judgment notwithstanding the verdict. The first assignment of error is overruled.
 II
The second assignment of error complains the court erred by denying AEMM's motion for remittitur because the $75,000 in damages awarded by the jury exceeded the amount which the jury could reasonably find under the facts. AEMM maintains the evidence showed that Robertson lost, at most, his $2,500 security deposit on the premises, so he could not have suffered anywhere near the amount of damages awarded by the jury.
The court instructed the jury, without objection from the parties, that Robertson would be entitled to be placed in the position that he would have been in had the contract not been breached. It is therefore fair to say the Robertson sought damages for his lost profits in starting a new business. This is a proper basis for damages in this case. See AGF, Inc. v. Great Lakes Heat Treating Co. (1990), 51 Ohio St.3d 177, paragraph two of the syllabus.
Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty. See Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co. (1984), 12 Ohio St.3d 241, paragraph two of the syllabus; see, also, Gahanna v. Eastgate Properties, Inc. (1988), 36 Ohio St.3d 65.
The evidence showed that the parties contemplated that Robertson would make a profit in the new location. This is not a surprising point, as it is the rare business that opens without the expectation of making a profit, so this factor likely speaks for itself. Nevertheless, the court had the additional fact that Robertson was taking over a successful, established retail business with a proven track record of profits. Robertson and the owner of the existing business agreed that the managerial duties Robertson performed with the existing business would carry over to the new business thus ensuring continuity between the two businesses. The jury could therefore believe that the new business would be a continuation of the old business and that the old business' profit history would be a suitable yardstick for the new business. Abboud knew this, as Robertson told him that he chose the new location because he believed it would provide better retail exposure to potential customers and would have been a very good location to establish the business there. This was competent, credible evidence that the parties expected Robertson to turn a profit.
The court also heard competent, credible evidence to show that Robertson's lost profits were a probable result of AEMM's failure to rennovate the premises. Robertson testified that he was trying to move the business as quickly as possible in order to avoid having to make additional lease payments hence the lease agreement between him and AEMM showed that time was of the essence. Abboud himself testified that he knew the additional construction work had to be performed as quickly as possible. This explained why he directed the architects to submit drawings that omitted plans to bring the retail space up to code. The jury could reasonably conclude that Abboud's directives to the architects caused the project needless delay, as there was a significant lead time between submitting plans to the city building department and final approval of those plans. The building inspector testified that it was a near certainty that building plans which omitted remediation of existing code violations would be rejected, thus setting back the entire project. Robertson undeniably operated on a shoestring, but Abboud knew this fact and had to know that the delays in improving the retail space tapped out Robertson's resources to the point where he wound up having no funds available for operating the business.
Finally, Robertson established the amount of lost profits with reasonable certainty. Robertson's deal to take over the business required him to purchase the $40,000 inventory of the existing business. Robertson was to hire the previous owner at a salary of $35,000 per year and this salary would be used to pay off the inventory. Testimony showed that the old business paid salaries out of operating profit, and averaged a yearly profit of roughly $80,000 per year over a five year period. Robertson was to pay himself a salary of $40,000 a year, so his agreement to pay his partner a salary of $35,000 a year would still have left a cushion of $5,000 under the past profit history. And this is not factoring in Robertson's belief that the move to a new location would help sales. A damage award of $75,000 was certainly reasonable.
AEMM argues that Robertson only invested $2,500 in the business by virtue of his security deposit, and that is the only measure of damages Robertson would be entitled to receive. It is true that Robertson had very little capital invested in the business, but this fact does not strike us as being significant in any discussion of lost profits. Robertson presented evidence showing that he reasonably believed he would make a profit by moving an existing business to a better location. It makes no difference that he did not tie up his own money, as the determination of lost profits is not dependent upon a showing of what out-of-pocket expenses Robertson made before opening the business. We find evidence to support the damage award and find remittitur is not warranted. The second assignment of error is overruled.
 III
The third assignment of error complains that there was no meeting of the minds sufficient to form a valid contract because of the ambiguity in paragraph 3(g) of the lease agreement. AEMM did not raise this issue below, so we cannot consider it for the first time on appeal. Republic Steel Corp. v. Bd. of Revision of Cuyahoga Cty. (1963), 175 Ohio St. 179, syllabus. But in any event, our discussion in the first assignment of error should dispel any doubt that the parties believed they had an enforceable contract, subject only to the mistaken use of the term Tenant, which the jury resolved in Robertson's favor. The third assignment of error is overruled.
It is ordered that appellees recover of appellants their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _____________________________________ MICHAEL J. CORRIGAN, PRESIDING JUDGE:
PATRICIA A. BLACKMON, J., and JOHN T. PATTON,* J., CONCUR.
* SITTING BY ASSIGNMENT: Judge John T. Patton, Retired, of the Eighth District Court of Appeals.