OPINION.
This is an appeal from an order enforcing a consent decree that confirmed the right of the State Teachers' Retirement System Board of Ohio (STRS) to exercise an option to purchase the Kenwood Towne Centre. The order resulted from a motion to enforce the consent decree brought by the owners and sellers of the Centre, the Kenwood Plaza Limited Partnership (KPLP). The order resolved disputes concerning outstanding adjustments to the purchase price. In its six assignments of errors, STR challenges both the finality of the judgment appealed from, as well as the trial court's resolution of the substantive issues. For the reasons that follow, we affirm.
 FACTS
A. The Original Litigation and the Consent Order and Judgment
This action originally began as two opposing lawsuits that were consolidated in the trial court. The subject matter of the two lawsuits was STRS's right to purchase the Kenwood Towne Centre from KPLP. A settlement eventually reached between the parties resulted in a negotiated "Consent Order and Judgment" entered on November 6, 1998. The judgment decreed that (1) STRS had a valid option to purchase the Centre, (2) STRS had validly exercised that option, and (3) STRS was entitled to specific performance. The consent order permitted STRS "to purchase the Centre in conformity with the Option Agreement as amended by this Consent Order and Judgment."
The consent order also contained two additional items pertinent to this appeal. First, the court expressly retained jurisdiction "for the enforcement of this Order." Second, the order expressly provided that "[a]ll legal fees and expenses incurred by any party in the enforcement of this Order shall be paid by the non-complying party."
B. The Sale
In December of 1998, KPLP chose to transfer the Centre to STRS utilizing a tax- deferred exchange. Authorization for such a transaction appeared in paragraph five of section II of the consent order. The exchange triggered paragraph four of section II, which set the purchase price at $20,000,000 "less closing costs and normal prorations." (Emphasis in original.)
C. The Enforcement Action
In its motion to enforce the consent order, KPLP asserted that STRS had, contrary to customary practice, refused to negotiate on the closing statement. According to KPLP, STRS announced that it would unilaterally prepare the closing statement to be used for the sale and then did not exchange this information with KPLP until after the partnership had transferred its interest in the Centre.
When KPLP was finally given STRS's "Statement of Credits, Closing Costs and Prorations," KPLP found objectionable almost $2,000,000 in deductions. One of the deducted items was $1,674,230,000 for "Estimated Settle-up Amount from KPLP." KPLP asserts that, despite its repeated requests, STRS "has never documented or explained its calculation on this item." Another item STRS deducted was $1,125.00 for "Asbestos Credit."
KPLP filed the motion to enforce the consent order in January 1999. While the motion was pending, other issues arose between the parties in connection with a final accounting undertaken to allocate the Centre's 1998 revenue. Eventually, accountants for both sides were able to reach agreement on most of these issues. But by the time the "Motion for Enforcement" came to be heard, eight items remained.
D. The Trial Court's Ruling
The trial court found that KPLP was entitled to judgment on the following issues:
Asbestos removal ($1,125,000,000);
Bowling alley lease termination ($120,000);
Percentage of rent calculation ($247,520);
STRS's claim for legal fees ($98,245);
STRS's claim for accounting fees ($67,000);
KPLP's attorney fees for enforcing the terms of the option agreement ($143,904).
Conversely, STRS was found entitled to judgment on three items:
The Met Life appraisal fee ($25,000);
Title insurance fees ($304,026);
Conveyance fee and transfer tax ($222,318).
Additionally, STRS was expressly found not entitled to attorney fees in enforcing the terms of the option agreement.
 FINALITY
In its second assignment of error, STRS challenges the finality of the trial court's order. It is curious that this issue would be raised by STRS because it is one that would seemingly defeat its ability to challenge the validity of the trial court's enforcement of the consent order. Nonetheless, we address it first due to its jurisdictional significance for our appellate review.
The gist of STRS's argument is that the trial court erred by resolving the issues in a "Final Judgment Entry" when there remained other outstanding issues among the parties concerning the purchase price. STRS raised this issue before the trial court in its written objections to KPLP's proposed "Final Judgment Entry." During the hearing on the objections, STRS represented to the trial court that two other matters posed potential areas of dispute, thus precluding the entry of final judgment for either side.
The trial court overruled the objection, stating that the parties had stipulated to only eight disputed items for the purposes of resolving KPLP's motion to enforce the consent order. The trial court then advised STRS, "I'm saying this. Leave that other disputed item for some other time in the future, because you're still working on it apparently, and bring it in some other time." The court then signed and entered the judgment entry proposed by KPLP, which, as noted, was captioned a "Final Judgment Entry," and which stated in its opening paragraph that the parties had agreed and stipulated that "the only items then remaining in dispute" were the eight items resolved in the entry.
KPLP dismisses STRS's argument that other issues remain outstanding as "disingenuous and misleading." According to KPLP, the only other sticking points between the parties have been settled and there is nothing left to litigate. KPLP cites to an exchange during the proceedings below in which counsel for STRS appeared to agree that the eight items before the court were all those being contested. KPLP also observes that STRS never attempted to bring any other issues before the court.
Although it was styled as a "Final Judgment Entry," it is unclear whether the trial court's order was intended to affect its earlier express retention of jurisdiction in the original consent order. Even if we assume, however, that the court intended to retain jurisdiction to enforce the consent order, such reservation would not necessarily have affected the question of finality. "It is settled law that a court's retention of jurisdiction to facilitate the consideration of possible future relief does not undermine the finality of an otherwise appealable order." Cusumano v. Microsoft Corp. (C.A.1, 1998), 162 F.3d 708,711-712, cited in Futernick v. Sumpter Township (C.A.6, 2000),207 F.3d 305, 311; and see, generally, Wright, Miller Cooper, Federal Practice and Procedure (2 Ed. 1992), Section 3915.3, at 287. If the other requirements of finality are met, a "reservation to make further orders does not mean orders inconsistent with the finality of the judgment."Johnson v. Wilson (C.A.9, 1941), 118 F.2d 557, 558, quoted in PiocheMines Consolidated, Inc. v. Fidelity-Philadelphia Trust Co. (C.A.9, 1952), 191 F.2d 399, 400.
The question of finality rests, therefore, upon application of the criteria for a final order in R.C. 2505.02. Subsections (B)(2) and (3) can be quickly eliminated from consideration because the order here did not arise out of a special proceeding[1] or vacate or set aside a judgment. The two remaining subsections, (B)(1) and (4), however, require our consideration.
Under subsection (B)(1), an order is final when it affects a substantial right in an action "that in effect determines the action and prevents a judgment." Despite STRS's argument to the contrary, the order appealed from purports to be a final judgment in other words, a final resolution of all outstanding issues between the parties. As noted, although the trial court may have, in its remarks from the bench, alluded to some retention of authority to enforce the original consent order, the language of the "Final Judgment Entry" clearly connoted finality. It is axiomatic that a trial court speaks through its journal, not through its verbalized comments. There is nothing in the language of the order itself that would suggest that the order was interlocutory in nature.
Further, under subsection (B)(2), an order may also be deemed final if it grants or denies a "provisional remedy" to which the following can be said to apply:
The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy.
 The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action.
 As defined by statute, a "provisional remedy" means "a proceeding ancillary to an action, including, but not limited to, a proceeding for a preliminary injunction, attachment, discovery of privileged matter, or suppression of evidence." R.C. 2505.01
(A)(3). Recently, the Ohio Supreme Court has held that, "for purposes of R.C. 2505.02(A)(3)'s definition, `[a]n ancillary proceeding is one that is attendant to or aids another proceeding."' State v. Muncie (2001), 61 Ohio St.3d 440, 449, 746 N.E.2d 1092, 1100, quoting Bishop v. Dresser Industries (1999), 134 Ohio App.3d 321, 324, 730 N.E.2d 1079, 1081.
Under the definition of a provisional remedy articulated in Muncie, we hold that an order enforcing a consent order is a provisional remedy under R.C. 2505.01(A)(3). Here, the action between the parties, which was a dispute concerning STRS's right to purchase the Centre, was originally resolved in the "Consent Order and Judgment" entered by the trial court on November 6, 1998. To aid in the enforcement of the order, the court retained jurisdiction. The proceedings held pursuant to that retention of jurisdiction were clearly ancillary, or attendant, to the main action.
We hold, furthermore, that the requirement of R.C. 2505.02(B)(4)(a) is satisfied because the court's "Final Judgment and Entry" determined the enforcement proceedings against STRS. The only requirement remaining, therefore, is that contained in R.C. 2505.02(B)(4)(b), which denies finality to an order arising from a provisional remedy unless "the appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action."
According to the court in Muncie, subsection (B)(4)(6) is a recognition by the legislature that, "in spite of a court's interest in avoiding piecemeal litigation, occasions may arise in which a party seeking to appeal from an interlocutory order would have no adequate remedy from the effects of that order on appeal from final judgment." Muncie, supra, at 451, 746 N.E.2d at 1101. Once described as situations involving "irreparable harm," current examples of orders denying a party an adequate remedy unless granted an immediate appeal are those requiring the disclosure of trade secrets or privileged material,[2] or, as in the case of Muncie, the involuntary administration of antipsychotic drugs.
Although STRS argues that there remain outstanding issues and claims and that final judgment should have awaited their resolution, it is only theoretical that the trial court will again exercise whatever jurisdiction it retains under the consent order. It is entirely possible that the trial court will refuse to entertain any further matters. Further, even if the court would chose to exercise its jurisdiction and determine any further matters, there is no reason to believe that it would revisit any of the issues here. Therefore, in the absence of something unpredictable, STRS would not be afforded an adequate remedy on these issues should it later seek to appeal them.
Based upon the foregoing, we hold that the order appealed from is a final appealable order and therefore that this court has jurisdiction to hear this appeal.
ATTORNEY FEES
In its first assignment of error, STRS argues that the trial court erred in awarding $143,904 in attorney fees to KPLP. According to STRS, the award was premised upon the erroneous assumption that STRS had withheld, and had the benefit of, $1,642,103 that should have been paid to KPLP.
KPLP remonstrates, and we agree, that STRS's argument proceeds upon a false premise — that the trial court's decision to award the attorney fees was based upon some theory akin to unjust enrichment and monies paid between the parties. The trial court made quite clear, however, that the award of attorney fees was made pursuant to paragraph fourteen of Section II of the consent order, which stated that "[a]ll legal fees and expenses incurred by any party in the enforcement of this Order shall be paid by the non-complying party." As KPLP correctly points out, this language "does not condition the award of [attorney] fees on any finding with respect to the net amount due."
The only basis for STRS to challenge the award of attorney fees, therefore, is to argue that the trial court erred by misconstruing STRS as the noncomplying party. The only way for STRS to succeed in this argument would be to prevail on the arguments it makes under its remaining assignments of error concerning the trial court's resolution of the substantive issues that led it to conclude that STRS was the "non-complying party." Before determining the validity of the attorney fees, therefore, we turn to the remaining assignments of error.
ASBESTOS REMOVAL
In its third assignment of error, STRS argues that the trial court's disallowance of the deduction for the asbestos removal was contrary to law, against the weight of the evidence, and an abuse of discretion. Specifically, STRS contends that the trial court erred by failing to properly weigh parol evidence that the parties intended to allow for such a deduction. KPLP argues, on the other hand, that the trial court's consideration of the parol evidence presented a question of fact that it was the trial court's distinct province to resolve. We agree with KPLP.
Initially, we note that KPLP originally moved to preclude the introduction of parol evidence on the asbestos deduction, arguing that the terms of the consent order were unambiguous. The trial court denied the motion and considered the evidence presented by both parties on this issue. The evidence consisted of the testimony of the participants with respect to the negotiating process. Their testimony presented a conflict, one side arguing that the parties intended there to be a deduction from the purchase price itself, the other side arguing that the deduction had already been factored into the calculation determining the purchase price. The lead negotiator for KPLP, Robert Falb, testified that it was "simply not true" that the parties had intended the costs of asbestos removal to be a further deduction from the purchase price. Both counsel for KPLP and another expert real-estate attorney who assisted in the negotiations on KPLP's behalf corroborated his testimony.
It is well settled that "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. In a civil case, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."Shear v. West American Ins. Co. (1984), 11 Ohio St.3d 162, 164,464 N.E.2d 545, 547; C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.
According to STRS, the trial court "conducted an evidentiary hearing, heard the evidence as to what the parties represented to each other during the settlement negotiations, but then [because of the conflicts of the evidence] the trial court chose not to decide whether the parties intended that the $1,125,000 for asbestos removal be deducted." We disagree. In its opinion, the trial court stated the positions of the two sides and noted the "plethora of contradictions as to what was and what was not `settled' during the three days' discussion before the draft of the consent order." The court then stated,
 The Consent Order called for an effective purchase price of $20,000.00 reduced only by closing cost and normal prorations [emphasis added]. Based upon the documents and the testimony of others besides Themming or Falb, asbestos removal credit is not a normal proration or closing cost. More likely than not, it was a component of the calculation of the purchase price.
 We interpret this to mean that, after considering the parol evidence of the parties' intent, the trial court found the evidence conflicting and ultimately resolved the matter in KPLP's favor based upon the testimony of its witnesses, the language of the consent order, and parol evidence of the meaning of the term "normal prorations" within the industry. Based upon all these factors, the court concluded that it was "more likely than not" that the cost of asbestos removal had been negotiated in the initial calculation of the purchase price.
We hold that the trial court's judgment was supported by some competent, credible evidence. We reject, further, STRS's argument that the trial court exceeded the scope of the parol evidence rule when it allowed KPLP to present evidence as to the accepted meaning, within the commercial real-estate industry, of the term "normal prorations." KPLP presented expert testimony that the term was normally used to signify "an allocation or porportionment of a cost through either the day of closing or possession," a category into which an asbestos deduction did not fall. The parol evidence rule is broad enough to encompass evidence of the meaning of terms within a particular industry, and it is not solely limited to statements as to what the parties' subjectively understood the terms to mean. See Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, 248, 374 N.E.2d 146, 161; United States Fidelity Co.v. St. Elizabeth Med. Ctr. (1998), 129 Ohio App.3d 45, 56,716 N.E.2d 1201, 1208.
Finally, STRS argues that the trial court erred by not finding that it was entitled to a deduction of the cost of asbestos removal based upon the doctrines of promissory and equitable estoppel. As pointed out by KPLP, both doctrines require either a promise or some form of representative conduct sufficient to justify reliance by the party asserting the doctrines. See Mers v. Dispatch Printing Co (1985),19 Ohio St.3d 100, 104, 483 N.E.2d 150, 154; In re Ohio Knife (Oct. 21, 1992), Hamilton App. Nos. C-910482 and C-910488, unreported. As noted, the trial court, after examining the parol evidence, concluded that, "[m]ore likely so than not, [the cost of asbestos removal] was a component in the calculation of the purchase price." In other words, the trial court found that the evidence weighed in favor of the determination that the purchase price had already been reduced by the cost of asbestos removal. It makes no sense, therefore, for the trial court to have found that STRS was equitably entitled to a second deduction for the same thing. It makes no sense, further, for the trial court to have found that the parties intended the cost of asbestos removal to be an adjustment of the purchase price, and yet that STRS was justified in believing that it was entitled to a further deduction prior to closing.
STRS's third assignment of error is overruled.
ACCOUNTING AND LEGAL FEES
In its fourth assignment of error, STRS asserts that the trial court erred when it concluded that language in the option agreement charging KPLP with "[a]ll costs and expenses of the purchase" did not include STRS's accounting and legal expenses. According to STRS, the court erred by failing to recognize that the term "[a]ll costs and expenses of the purchase" was not the same as "closing costs," which traditionally do not include such items. The term "[a]ll costs and expenses of the purchase," according to STRS, was intended by the parties to make an exception to the normal practice in real-estate transactions that each party be responsible for its own accounting and legal fees.
Again, the trial court allowed the parties to present parol evidence on the meaning of the disputed language. KPLP presented expert testimony that it was the practice and custom in Ohio that each party bore its own attorney fees, and that when an exception was made to this rule, the parties either expressly set or provided a cap for the amount of the fees. The trial court's ruling reflects that it accepted the testimony of the expert and concluded that, if the parties had actually meant to deviate from the general practice, they would have done so in language plainly requiring KPLP to pay STRS's legal fees. Further, KPLP presented expert testimony that it was not customary for accounting fees to be charged to the other party in a sale of real estate as a cost or expense of the purchase. The trial court accepted this testimony as well.
STRS argues that the court's ruling denied the term "all costs and expenses" its plain meaning. But where literal application of the term clashed with custom and practice, use of the word "all" did create an element of ambiguity with regard to the parties' intent, since one would have expected that such a significant deviation from the norm would have been set forth more explicitly than just a nonspecific use of the word "all." As KPLP points out, if the parties had actually intended that KPLP would pay STRS's accounting and legal fees, it would have been a simple matter to have stated this with express language. Indeed, if payment of such items had been successfully negotiated by STRS, it would seem that STRS would have insisted upon far more detailed language.
STRS also argues that the fact that KPLP had paid $500,000 in legal expenses incurred by STRS in connection with the initial loan transaction was further proof that the term "[a]ll cost and expenses" in the option agreement was meant to include attorney fees. According to STRS, such prior conduct irrefutably demonstrated the construction that the parties intended to place on the term. See, e.g., Money Station, Inc. v.Electronic Payment Serv., Inc. (1999), 136 Ohio App.3d 65, 71,735 N.E.2d 966, 970. KPLP contends, however, that its earlier payment of attorney fees was part of the initial loan payment, the terms of which were set forth in the "Commitment," not in the option agreement. The "Commitment" expressly obligated KPLP to pay the "reasonable fees and reimbursable expenses * * * incurred in the negotiation and preparation of this Commitment, the Loan Documents, and closing of the Loan and any and all other incidental expenses."
As with our resolution of the third assignment of error, we hold that there was competent and credible evidence to support the trial court's construction of the phrase "[a]ll costs and expenses," and therefore we find no reversible error in the court's resolution of this issue. STRS's fourth assignment of error is overruled.
BOWLING-ALLEY LEASE STRS's fifth assignment of error concerns its attempt to deduct from the purchase price $120,000 for termination payments that remained due after the closing date to a former tenant at the Centre, Kenwood Lanes. The bowling alley had previously been located at the Centre under a long-term lease, paying rent that was significantly below market value. On October 30, 1995, KPLP entered into a written contract with the bowling alley to cancel the lease in return for annual payments of $60,000 through the year 2000. KPLP took the position that the payments for 1999 and 2000 became the responsibility of STRS after the Center changed hands at the end of 1998. STRS refused, however, to make the payments, claiming that KPLP remained liable for them under the terms of its written contract with the owners of the bowling alley.
KPLP argued in the trial court that STRS was responsible for the two remaining termination payments owed to Kenwood Lanes under the express language of the consent order that made STRS "exclusively responsible for costs and expenses associated with the ownership and operation of the Centre" after the closing date. In support of its position, KPLP presented the testimony of a real-estate accounting expert that the outstanding termination payments should have been borne by the party enjoying the benefit, in other words, STRS since it had acquired the advantage of being able to rent the space vacated by the bowling alley at a level that was at market value or above. STRS presented evidence and argument, on the other hand, that under proper accounting principles, the payments were a pre-existing liability of KPLP, and that the consent order required that the standard accrual method of accounting be applied. Under the standard accrual method, STRS argued, income and expenses were based upon when the debt was incurred.
In that part of its opinion addressing the bowling-alley lease-termination payments, the trial court stated,
 Some three years before the transfer of the Centre from KPLP to STRS, KPLP had entered into a buyout agreement with a tenant who leased space for the operation of a bowling alley. The purpose of the agreement was to remove a below-market paying tenant in order to clear space for a more upscale higher-rent tenant. The buyout was to be made in five annual payments of $60,000.00. Two of the annual payments remained owing after the transfer date of the Centre.
 The remaining two payments were not a pre-existing liability of KPLP. Even though the obligation for the lease termination payments was incurred before the closing, these subsequent payments are not ordinary operating expenses. These payments benefit STRS by opening the space for a potential higher paying tenant. The fact that no new tenant has ever been found is irrelevant because the benefit of the empty space redounds to STRS as owner of the Centre and therefore should be treated as incurred after its assumption of ownership.
 As with the other issues before it, the court was presented with conflicting evidence concerning the proper treatment of the termination payments, the accounting principles that were involved, and the particular language of the consent agreement that applied. The arguments that STRS makes on appeal are those that were presented to the trial court and rejected. These arguments concern matters that were not separately addressed in the consent order and were therefore open to construction. Again, we find no error of law in the trial court's resolution of this issue, and we hold that some competent, credible evidence supported its judgment. The issue was tried and STRS lost. Accordingly, STRS's fifth assignment of error is overruled.
PERCENTAGE RENTS STRS's final assignment of error concerns the issue of percentage rents for December 1998. A percentage rent was an additional amount payable by a retail tenant at the Centre when its annual sales exceeded a level defined in its lease and referred to as a "breakpoint." The additional rent due was computed as a percentage of the amount by which the tenant's sales exceeded the breakpoint. Some of the retail tenants at the Centre did not exceed their breakpoint until after December 15, 1998, in other words after the Centre had changed hands. STRS took the position that it was entitled to all of the percentage rents from these tenants, even though the breakpoint had been achieved in large part by sales generated during the first eleven and one-half months of 1998 that KPLP had owned the property.
The question before the trial court was how these particular percentage rents fit into the language of the consent order. STRS argued that allocation of the percentage rents was controlled by language that stated, "STRS shall be entitled to the exclusive rights to all economic benefits derived from the Centre." KPLP, on the other hand, asserted that the operative language was that which entitled KPLP to the receipt of funds from the Centre "as determined by the standard accrual basis." Again, both sides presented testimony on standard accounting principles and industry practice. Resolving this issue, the trial court stated in its opinion,
 Because the "breakpoint" is normally reached late in a year, typically the month of December, the calculation occurs at the end of a year. KPLP owned the Centre for the year 1998 except for the last fifteen (15) days of December. Both parties offered evidence, by their respective accountants, as to the proper allocation of rental income for 1998. From a logical and accounting standpoint, the December sales should be prorated between KPLP and STRS based on the number of days each owned the Centre. KPLP was the owner for about 95% of the year, during which time the tenants were generating the "sales" that enabled them to reach their "breakpoint" near the end of the year; therefore, KPLP should receive its proportionate share of the Centre's percentage rent income because the "sales" which gave rise to most of the percentage-rent income occurred during KPLP's ownership.
 Again we find no error of law in the court's resolution of this issue, which required that it take broad, unspecific language in the consent agreement and apply it to a particular situation. Neither side's approach was unreasonable; however, the trial court found persuasive the evidence presented by KPLP that the correct methodology for allocating percentage rents was to grant KPLP credit for the sales generated during its ownership of the Centre for all but the final two weeks of the year. We cannot find any language in the consent order that unambiguously precluded such a solution, which otherwise found positive support in the language adopting the accrual method as a general rule in determining the allocation of receipts.
Accordingly, we overrule STRS's sixth assignment of error. Moreover, because we have found no merit in any of its assignments of error challenging the trial court's resolution of the substantive issues before it, we hold that the trial court correctly identified it as the noncomplying party under the language of the consent order imposing attorney fees. Hence we overrule STRS's third assignment of error as well.
Accordingly, the judgment of the trial court is affirmed.
PAINTER and SHANNON, JJ., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
[1] A "special proceeding" is statutorily defined as an action or proceeding that is "specifically created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity." R.C. 2505.02
(A)(2).
[2] See Gibson-Myers Assoc. v. Pearce (Oct. 27, 1999) Summit App. No. 19358, unreported; Cuero v. Snell (Sept. 26, 2000), Franklin App. No. 99AP-1458, unreported.